UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FRANK DEVITO,

      Plaintiff,

v.                                                                  Case No. 8:19-cv-2764-SPF

WEST PUBLISHING CORPORATION,

      Defendant.

_____/

**ORDER**

    This cause comes before the Court for consideration of Defendant's Dispositive Motion for Summary Judgment (Doc. 86), Plaintiff's Response in Opposition thereto (Doc. 87), Defendant's Reply in Support thereof (Doc. 92), and the parties' Joint Statement of Undisputed Facts (Doc. 85). Because Plaintiff has failed to establish a prima facie case of retaliation and has failed to demonstrate that Defendant's legitimate, nondiscriminatory reasons for Plaintiff's termination were pretextual, Defendant's motion is granted.

## I.    FACTUAL BACKGROUND

    Defendant hired Plaintiff in 2015 as a sales representative marketing directly to law firms. (Doc. 34 at ¶ 8; Doc. 85 at ¶¶ 1-3). The sales representative position, known as a Client Development Consultant (CDC), reports to a Regional Sales Manager (RSM) while the RSMs report to one of two Directors of Sales, who, in turn, report to the Vice President of Sales. (Doc. 85 at ¶¶ 3-5). As a CDC, Plaintiff reported to RSM Erica Butcher. (Doc. 85 at ¶ 6).

In 2016, Butcher was promoted to Director of Sales for the Eastern Division, and, on April 1, 2016, Plaintiff accepted a promotion to RSM for the Florida region, taking Butcher's RSM position.  (Doc. 85 at ¶¶ 7-8).  As an RSM, Plaintiff supervised a team of approximately ten CDCs and continued to report to Butcher.  (Doc. 85 at ¶ 9).  Each CDC has an individualized monthly sales quota, and the Performance Management Guidelines outline when a CDC qualifies for a Performance Improvement Plan (PIP), which consists of progressive warnings for poor sales performance.  (Doc. 85 at ¶¶ 11-12).  Plaintiff had access to monthly sales data for CDCs on his team and was responsible for relaying that information to the Director of Sales and Human Resources (HR).  (Doc. 85 at ¶ 15).

Defendant alleges that problems quickly became apparent, and, in September 2016, Butcher counseled Plaintiff on his management style.  More specifically, Butcher, after consulting with Vice President of Sales William Ballard and Senior HR Manager Amy Hendrickson, advised Plaintiff that "if we do not see an improvement in your communication style or we hear additional complaints from your team members our actions could include moving to a written Performance Management plan."  (Doc. 86-3 at 15-16).  Although Defendant did not specifically advise Plaintiff of subsequent complaints against him by CDCs, Defendant fielded complaints about Plaintiff's management style from five different CDCs, both men and women, in October and November 2016.  (Doc. 88-3 at 24:23-25:4; Doc. 86-7 at 99:21-24; Doc. 86-5 at 114:10-118:1; Doc. 86-2 at ¶ 8; Doc. 86-2 at 11-15; Doc. 86-3 at ¶ 6; Doc. 86-3 at 17-60).

It was "midway through 2017" when Plaintiff complained directly to Butcher that she was discriminating based on gender.  (Doc. 86-1, Pl. Dep. at 19:20-20:23).  Plaintiff testified that he approached Butcher and said to her: "[W]e have to be very careful because the

2

appearance on my team is that we're treating the females on my team different than the males relative to performance evaluation plans, and moving on them to be terminated for lack of performance or be on corrective counseling or running through the corrective counseling components…." (Doc. 86-1, Pl. Dep. at 20:6-12).

At some point in 2017, Butcher instructed the RSMs that they could not expense any costs for holding team events.  (Doc. 85 at ¶ 21).  Plaintiff held an event in Jupiter, Florida on August 31, 2017 for his team of CDCs that involved a boat ride where employees drank alcohol and then stayed overnight in a hotel.  (Doc. 85 at ¶¶ 22-23).  Between August 30 and September 1, 2017, Plaintiff expensed more than $1,850 for mileage, a hotel room,[1] hotel parking, and group meals in Jupiter.  (Doc. 85 at ¶ 24).  This included $404.52 for group meals where Plaintiff listed 7-9 CDCs in attendance.  (Doc. 85 at ¶ 24).  Plaintiff told the CDCs on his team not to expense the cost of their hotel rooms.  (Doc. 85 at ¶ 24).  After the event, all three female CDCs on Plaintiff's team separately reported to HR that Plaintiff had made comments that made them uncomfortable: (a) Stephanie Bandur reported that Plaintiff sent her a text late at night, inviting her to his hotel suite for drinks; (b) Nikki Alvis and Jessica Mertz reported that Plaintiff had made comments about female CDCs looking "sexy"; and (c) Mertz reported that Plaintiff had questioned whether she would continue working once she got married and started "having babies."   (Doc. 86-5 at 114:10-115:20).  Although Plaintiff's text message to Bandur said "Come to my room, 4044, to have some beverages with all of us.  We are waiting on you," Plaintiff denies that he invited Bandur to his "hotel

---

[1] Although irrelevant to this Court's analysis, Plaintiff distinguishes the hotel room as a business expense he was allowed to charge to Defendant under its travel policy because he traveled to Jupiter, Florida on business before the team meeting to work with CDCs and their clients.  (Doc. 86-6 at 45:36-39; Doc. 88-3 at 64:24-65:3, 66:21-68:4; Doc. 88-7 at 50:14-17).

room" but instead testified that he asked her to come to an "entertainment suite," not connected to his hotel room. (Doc. 86-1, Pl. Dep. at 144:3-145:14). CDC Alex Silva reported to Defendant that Plaintiff invited the entire team and that most CDCs attended. (Doc. 88-3 at 53:25-55:25). Although Plaintiff otherwise denies making any inappropriate comments, he does not deny that the three women reported that he had done so. (Doc. 87 at 3; Doc. 86-1, Pl. Dep. at 156:2-157:18).

When Butcher reviewed Plaintiff's expense reports after the event, she noticed that Plaintiff had been expensing recurring $25 Starbucks charges. (Doc. 86-7 at 91:2-7; Doc. 86-3 at ¶ 18; Doc. 86-4 at 82-83). Plaintiff admitted that the $25 charges were from reloading his Starbucks Gold Card, that the CDCs he listed on his expense reports were not actually with him when he incurred the charges, and that he did not itemize what he actually bought for each CDC, even though this was required by Defendant's Travel & Expense Reimbursement Policy, which states that for tax purposes, expense reports must include the names of all people in attendance, the name and location of the establishment, and the date of the expense. (Doc. 85 at ¶¶ 25-27; Doc. 86-1, Pl. Dep. at 172:22-173:2, 175:13-176:24; Doc. 85-11 at 9:3-8). Defendant's Travel & Expense Reimbursement Policy also states: "Beverages purchased other than with a reimbursable meal, including coffee (Starbucks, Caribou, etc.), alcohol, and soft drinks, should be kept to a minimum or considered personal and not submitted for reimbursement." (Doc. 85-11 at 8:25-27). On September 14, 2017, Butcher emailed Hendrickson with a summary of her conversation with Plaintiff regarding his August expense report and expense reimbursement practices. (Doc 86-4 at 82-83).

In September 2017, Plaintiff orally complained to Hendrickson in HR about Butcher's unequal treatment of male and female CDCs on his team and her discriminating and

retaliating treatment of Plaintiff.  (Doc. 86-1, Pl. Dep. at 63:4-17; Doc. 86-13 at 2:28-39).  It was also in September 2017 that Defendant granted Plaintiff's entire team a pass from PIPs due to Hurricane Irma.  (Doc. 85 at ¶ 31).

On November 16, 2017, Butcher issued Plaintiff a Final Written Warning for Behavior (Doc. 85 at ¶ 28; Doc. 86-1, Pl. Dep. 170:2-14; Doc. 85-12).  The Final Written Warning listed examples of Plaintiff's misconduct, including: (1) holding a team event with drinking on a boat that put Defendant at risk, (2) making inappropriate comments to female employees, and (3) submitting excessive coffee charges for reimbursement.  (Doc. 85-12).  The Final Written Warning further stated that "[a]ny further misconduct or violation of company policies will result in termination."  (Doc. 85-12).

In December 2017, Plaintiff again orally complained to HR that Butcher was engaging in gender discrimination and was retaliating against him for reporting her to HR.  (Doc. 86-13 at 2:36-40; Doc. 88-2 at ¶ 21).  Plaintiff also asserts that he followed up with Smith on several occasions in January 2018 with additional complaints about Butcher's gender discrimination and retaliation.  (Doc. 86-13 at 2:41-50; Doc. 88-2 at ¶ 24; Doc. 86-17 at 2:10-17, 3:28-29, 4:11-21; Doc. 86-18 at 1:6-16, 4:3-6, 4:39-42).

Although the Final Written Warning instructed that "it is not the company's practice to pay for multiple coffees during the day," and "you must immediately cease engaging in such behavior," Plaintiff subsequently expensed multiple cups of coffee on 31 separate days in less than three months, for a total cost of $383.24.  (Doc. 85-12 at 1:26-27, 2:30-31; Doc. 86-6 at ¶ 7; Doc. 86-6 at 4).  This included four days in which Plaintiff expensed three different Starbucks charges and another day in which he expensed four.  (Doc. 86-6 at 68:12-13, 26, 42-43).

Ballard and HR instructed RSMs not to expense meals for the January 2018 Annual Sales Meeting (ASM) because Defendant was providing all employees with three meals a day during the event. (Doc. 86-1, Pl. Dep. at 212:25-213:3; Doc. 86-7 at 164:11-25). Plaintiff expensed more than $500 at the ASM as "meals," both individual and group. In fact, Plaintiff submitted an expense report from the ASM with six charges that he listed as "Meals – Alone" for "breakfast," "lunch," or "dinner." (Doc. 86-6 at 30:14-20, 30:28-33, 31:39-45, 32:11-30). Plaintiff also expensed $570.03 as "Meals - Group." (Doc. 86-6 at 30:34-31:38, 31:45-32:10).

On February 15, 2018, there was an event to celebrate attorneys who had been named to SuperLawyers. (Doc. 85 at ¶ 34). Before the event, Plaintiff emailed Butcher, "I'd like to see Rudy, Doug & Juan [Rodriguez] go to this one … Thoughts?" (Doc. 85 at ¶ 34; Doc. 85-18 at 3:27-29). Butcher replied, "Rudy and Doug works. Juan no." (Doc. 85 at ¶ 34; Doc. 85-18 at 3:10). Plaintiff said, "I agree." (Doc. 85 at ¶ 34; Doc. 85-18 at 2:50). Plaintiff subsequently sent Rodriguez to the event. (Doc. 85 at ¶ 34; Doc. 86-1, Pl. Dep. at 101:5-13). When Butcher questioned Plaintiff about sending Rodriguez, he replied, "Remember, you never asked me what I thought, you told me. Bad formula. For this to work, it needs to be a two-way conversation." (Doc. 85-18 at 1:9-10; *see also* Doc. 86-10 at 1:9-10).

When Butcher learned that Plaintiff disobeyed her directive for the SuperLawyers event, she consulted with Ballard and Senior HR Manager Susan Smith. (Doc. 86-3 at ¶ 20; Doc. 86-4 at 86:33-47). Ballard replied that Plaintiff's "total disregard" of Butcher's instructions was "unacceptable" and that "[c]oupled with all the other issues that we have investigated I would recommend and support termination." (Doc. 86-4 at 86:19-21). Smith then decided to terminate Plaintiff's employment, with input from Butcher and Ballard, for an ongoing pattern of insubordination, citing the three above examples. (Doc. 86-7 at 157:21-

158:5; Doc. 86-5 at 183:16-23; Doc. 86-3 at ¶ 21; Doc. 86-4 at 90).  Plaintiff was terminated on March 1, 2018.  (Doc. 85 at ¶ 35).

In his Amended Complaint, Plaintiff alleges one count of retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* as amended by the Civil Rights Act of 1991 ("Title VII") and the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.* ("FCRA").[2]  (Doc. 34).  More specifically, Plaintiff alleges that Defendant gave him negative performance reviews and then terminated him for complaining about gender discrimination to HR.  (Doc. 34 at ¶ 19).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if all the pleadings, discovery, affidavits, and disclosure materials on file show that there is no genuine disputed issue of material fact, and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a) and (c).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A fact is material if it is a legal element of the claim that may affect the outcome of the suit under the substantive governing law.  *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could find for the non-moving party.  *Anderson*, 477 U.S. at 248.  In determining whether a genuine dispute of material fact exists, the court must view the evidence and all factual inferences drawn therefrom in the light most favorable to the non-

---

[2] The Court uses the same analysis for retaliation claims under the FCRA as it does for Title VII retaliation claims.  *See Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver,* 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson,* 477 U.S. at 252). In other words, summary judgment is appropriate if a plaintiff offers only evidence that is "merely colorable, or is not significantly probative." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080-81 (11th Cir. 1990).

## III.   DISCUSSION

Defendant argues it is entitled to judgment on Plaintiff's retaliation claim. In the Eleventh Circuit, Title VII claims for retaliation not supported by direct evidence, as is the case here, are often evaluated under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019); *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009). This framework provides that the plaintiff bears the initial burden of establishing a prima facie case of retaliation. *Lewis*, 918 F.3d at 1220-21. If the plaintiff successfully makes out a prima

8

facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for its actions. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). If the defendant provides such, the plaintiff must then show that the defendant's proffered reason was merely a pretext for unlawful discrimination. *Lewis*, 918 F.3d at 1220-21.

In addition to an evaluation under this framework, a "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). Upon consideration of the parties' submissions, the record, and applicable authorities, the Court finds that no reasonable jury could reach a verdict in Plaintiff's favor on his retaliation claim applying either analysis, but it will discuss the claim under the *McDonnell Douglas* framework as did the parties in their briefs.

### a. Prima Facie Case of Retaliation

Title VII makes it illegal for "an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). In order to establish a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in protected activity; (2) Defendant took a materially adverse employment action against him; and 3) there was a causal link between the protected activity and the adverse action. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013); *see also Walker v. Sec'y, U.S. Dep't of*

*Air Force*, 518 F. App'x 626, 627 (11th Cir. 2013)[3]; *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). "An employee's complaint about discrimination constitutes protected activity if the employee could reasonably form a good faith belief that the alleged discrimination existed." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (internal quotation marks omitted). And an "adverse employment action" is one that is materially adverse such that it might "well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). A termination qualifies. *See Jefferson*, 891 F.3d at 924 ("Termination is a materially adverse action."). The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Summary judgment is appropriate if the plaintiff fails to satisfy any one of the elements of a prima facie case. *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998).

While there is no dispute regarding the second prong—that Defendant took an adverse employment action against Plaintiff, Defendant asserts that summary judgment should be granted because Plaintiff did not engage in protected activity. The Court agrees.

i. *Protected Activity*

In order to constitute protected activity, an internal complaint must meet two requirements: (1) it must put the employer on notice that the plaintiff is opposing a practice made unlawful by Title VII, and (2) it must be based on a good faith reasonable belief that the employer engaged in unlawful discrimination. *See Murphy v. City of Aventura*, 383 F. App'x

_____

[3] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

915, 918 (11th Cir. 2010) ("A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination."); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999) (an employee must have a "good faith, reasonable belief" that the employer has engaged in unlawful discrimination).

Defendant contends that it was not put on notice by Plaintiff's complaints that Plaintiff was opposing a practice made unlawful by Title VII.  More specifically, Defendant argues that while Plaintiff may have complained about perceived "unfair treatment," he did not tell Defendant that he believed illegal discrimination occurred.  Plaintiff alleges that, on multiple occasions, he complained to Defendant's HR that Butcher was treating female employees more favorably than male employees and that Plaintiff was being subjected to gender discrimination and retaliation by Butcher.  (Doc. 34 at ¶ 22).  Plaintiff claims Butcher "would require Plaintiff to discipline male CDCs on his team whenever they failed to meet their monthly sales goal but then would direct Plaintiff not to discipline female CDCs on his team when they missed their monthly sales goals."  (Doc. 34 at ¶ 12; *see also* Doc. 86-1, Pl. Dep. 18:14-20:15; 59:25-60:9; 69:24-70:7; 83:23-84:8).  Plaintiff asserts that he engaged in statutorily protected activity by complaining to HR about this alleged directive from Butcher. (Doc. 34 at ¶ 22).  Moreover, Plaintiff, in part, points to his January 12, 2018 email to Smith titled "Frank De Vito's Team Info and Concern" in which he says both "I'm 'not' officially making a formal complaint at this time" and elaborates that "the concerns 'may' involve" being treated differently, targeting, discrimination/protection, retaliation, and obstruction of job performance.  (Doc. 86-17 at 2:4-17).

"When an employee communicates to [his] employer a belief that the employer has engaged in ... a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.,* 555 U.S. 271, 276 (2009) (internal quotation marks omitted). As the Eleventh Circuit has noted, "to engage in protected activity, the employee must...at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred." *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (internal quotations omitted); *see also Schiele v. S.E. Showclubs, LLC*, No. 8:16-cv-2308-T-30MAP, 2017 WL 10275968, at *4-7 (M.D. Fla. Nov. 8, 2017) (includes a survey of cases on what constitutes opposition to an unlawful employment practice). Based on this evidence, the Court finds, at a minimum, there is a genuine issue of material fact as to whether Plaintiff put Defendant on notice that he was opposing gender discrimination.

Defendant also contends that Plaintiff's complaints about discrimination do not constitute protected activity because Plaintiff could not reasonably form a good faith belief that the alleged gender discrimination existed. In other words, Plaintiff's opposition to gender discrimination was not "objectively reasonable." *See Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (To establish an opposition claim, under Title VII, a plaintiff must show "that he had a good faith, reasonable belief that the employer was engage in unlawful employment practices."). The Court agrees that Plaintiff's opposition to the alleged gender discrimination was not "objectively reasonable."

To meet the good faith reasonable belief prong, a plaintiff must show both that he "*subjectively* (that is, in good faith) believed that his employer was engaged in unlawful

employment practices" and also "that his belief was *objectively* reasonable in light of the facts and record presented." *Butler*, 536 F.3d at 1213 (citation omitted). Here, Defendant points to the PIP data for Plaintiff's team for 2016-17 (other than the three months when Defendant granted Plaintiff's entire team a pass), which team consisted of four women and nine men, and argues that female CDCs who failed to meet their monthly sales were actually disciplined more often than male CDCs. (*See* Doc. 86-3 at ¶¶ 13-16; Doc. 86-4 at 78-81). The only woman who received a pass (Mertz) received a pass only once out of the three times she qualified (33% of the time).[4] (Doc. 86-3 at ¶¶ 13-15; Doc. 86-4 at 77:11, 28; Doc. 86-4 at 78:8). On the other hand, Silva received a pass every time he qualified for PIP—three out of three times (100% of the time). (Doc. 86-3 at ¶ 16(f); Doc. 86-4 at 77:16, 33, 78:27). Dennis Gangwer received a pass five times out of the nine times he qualified for PIP (56% of the time). (Doc. 86-3 at ¶ 16(b); Doc. 86-4 at 77:9, 26, 78:23). Rudy Rodriguez-Chomat received a pass one of the two times he qualified (50% of the time). (Doc. 86-3 at ¶ 16(d); Doc. 86-4 at 77:13, 30, 78:25). Tom Fritchek received a pass two out of the five times he qualified (40% of the time). (Doc. 86-3 at ¶ 16(a); Doc. 86-4 at 77:8, 78:22). Michael Schneider received a pass one out of the three times he qualified (33% of the time). (Doc. 86-3 at ¶ 16(e); Doc. 86-4 at 77:14, 31, 78:26). Overall, the women on Plaintiff's team qualified for a PIP seven times, and a pass was granted just once in the seven times they qualified, *i.e.*, 14% of the time, while men who qualified received passes 12 out of the 26 times they qualified, *i.e.*, 46% of the time. (Doc. 86-4 at 78:1-30).

---

[4] Defendant asserts that Mertz was given the one pass because HR was investigating Mertz's allegation that Plaintiff had questioned whether she would return to work after she got married and started "having babies," and Butcher and Hendrickson believed it would be unfair to move Mertz forward in the PIP process if Plaintiff was potentially hindering her progress with inappropriate remarks and conduct. (Doc. 86-3 at ¶ 17).

Plaintiff cannot claim an objectively reasonable belief that Butcher was unlawfully discriminating against male CDCs in issuing PIPs. Plaintiff had access to monthly sales data for the CDCs and was responsible for relaying that information to Butcher and HR. In addition, Plaintiff issued the PIPs to his team. Therefore, Plaintiff knew how many times male versus female CDCs qualified for PIPs based on their sales data and how many times passes were granted for male versus female CDCs. Moreover, when a CDC qualified for a PIP based on their monthly sales data, the final decision on whether to issue a PIP was supposed to be a collaborative effort between the RSM (*i.e.*, Plaintiff), the Director of Sales (*i.e.*, Butcher), and HR (*i.e.*, Hendrickson), including considering any mitigating factors that would justify granting a pass. (Doc. 86-1, Pl. Dep. at 20:24-21:10; 114:4-15; Doc. 86-7 at 73:3-18). However, Plaintiff unilaterally issued PIPs to both male and female CDCs so many times that Hendrickson recommended issuing Plaintiff a written warning for insubordination. (Doc. 85 at ¶¶ 16-19; Doc. 86-3 at ¶ 10; Doc. 86-3 at 71-90).

Furthermore, Plaintiff does not dispute the PIP data proffered by Defendant. Instead, without any supporting authority for the validity of the request in a summary judgment context, Plaintiff suggests the Court should, when considering whether the data shows gender discrimination, exclude from the PIP statistics those CDCs given a pass because the CDCs performance was affected by (1) a natural disaster, (2) a diagnosed medical condition of the CDC or an immediate family member, or (3) bereavement. (Doc. 87 at 12). Plaintiff asserts that Defendant "generally" provided CDCs with relief from being moved forward in the PIP process if the CDC's performance was affected by one of the three enumerated reasons and cites to himself as authority for the assertion. (Doc. 87 at 12 (citing Doc. 88-2, Pl. Aff. at ¶ 31; Doc. 86-17, Pl. "Team Info and Concerns" email at 3:30-33)). This would exclude from

14

consideration both of Fritchek's passes; all five of Gangwer's passes; Rodriguez-Chomat's one pass; and two of Silva's three passes.  (Doc. 87 at 12).  Without more, the Court is not persuaded that these exceptions should be applied when considering the difference in discipline exacted between the two genders of CDCs.  However, even when excluding CDCs given passes for the above-enumerated exceptions, it appears that there remain two males who were granted passes (Silva in June 2017 and Schneider in July 2017) and one female who was granted a pass (Mertz in August 2017).[5]

At this point, Plaintiff attempts to establish his objectively reasonable belief that gender discrimination was occurring by arguing that Schneider was deserving of a pass while Mertz was not.  More specifically, Plaintiff asserts that when Schneider received his pass, he was well over 100% of his <u>yearly</u> sales objective and was the top performing CDC in the Florida region while Mertz was well below 100% on her <u>yearly</u> goal.  Defendant, however, does not factor yearly sales objectives into its PIP decisions, just individualized monthly sales quotas.[6]

---

[5] Plaintiff fails to adequately address whether an exception applies for Silva's June 2017 pass. Regardless of whether the Court considers Silva's June 2017 pass, however, the Court's conclusion remains unchanged.

[6] Plaintiff's assertion that "it is clear that the Director of Sales for the western sales division of West (Ms. Butcher's counterpart), using Defendant's same PIP program, <u>did not</u> move CDCs forward in the PIP process for missing monthly goals when that CDC was over 100% year-to-date" is unavailing.  (Doc. 87 at 13 n.9 (citing Doc. 88-5 at 1:14-19; Doc. 86-7 at 13:15-25)).  First, Plaintiff only points to an HR email that suggested, without any relevant statistics or details, that Defendant's East and West divisions were approaching the performance management process inconsistently regarding CDCs who were over 100% year-to-date.  (Doc. 88-5).  In that email to Ballard, HR referenced areas of inconsistencies between the divisions and asked whether CDCs who are over 100% YTD should be placed on PIPs.  (Doc. 88-5 at 1:17-18).  This is insufficient evidence of the differences in policy application between the divisions.  Furthermore, Ballard responded that "[i]f a CDC is over YTD – Do they still qualify for PIP? – Yes! This policy has been in place for many years … [it] needs to stay as is. I'm not sure why we are even discussing this one." (Doc. 92-1 at 2:12-16).  In other words, the East division historically did not consider the CDC's yearly sales objectives when determining whether to place a CDC on a PIP.  Plaintiff fails to cite to any authority for the

As such, Plaintiff's contention that Defendant should have made different decisions on PIP passes because Defendant should have been considering yearly sales objectives is unavailing. Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. *Kidd*, 731 F.3d at 1203 (citation omitted).  At best, Plaintiff's argument boils down to his opinion that Mertz should not have been given a pass in August 2017 because she was below her yearly goal.[7]  This does not equate to an objectively reasonable belief that Defendant was engaged in gender discrimination against males.  Moreover, Defendant points out that Plaintiff issued a PIP to CDC Bandur when she was over 100% YTD in the same month that Schneider was granted a pass (July 2017) when he was over 100% YTD.  (Doc. 92 at 3 n.7 (citing Doc. 86-4 at 46-48; Doc. 86-15 at 2:8-10, 4:1-20)).

Plaintiff also attempts to rely on the affidavits of two former male CDCs, Gangwer and Doug Gartz, to support his assertion that he had a reasonable belief that women were being favored.  (Doc. 86-19, Gangwer Aff.; Doc. 86-20, Gartz Aff.).  Upon careful review, their unsupported conclusory statements have no probative value in opposing summary judgment.  *See Hill v. Oil Dri Corp.*, 198 F. App'x 852, 858 (11th Cir. 2006) (citing *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000)); *see also Clover*, 176 F.3d at 1352 (other employees' complaints of suspected unlawful conduct are irrelevant in determining whether plaintiff had an objectively reasonable belief that unlawful conduct occurred).  Accordingly, any complaint Plaintiff made about perceived gender differences in PIPs does not constitute protected activity under Title VII because that belief was not *objectively* reasonable in light of

---

proposition that this type disciplinary distinction between divisions within a company somehow supports a finding of gender discrimination.

[7] Plaintiff acknowledged in his deposition that basing PIPs on year-to-date data was only his "personal belief" and "[n]ot necessarily recognized by the company."  (Doc. 86-1, Pl. Dep. at 242:19-243:7; Doc. 86-3 at 69:1-41).

the facts and record presented.

Similarly, Plaintiff has failed to establish a prima facie case of discrimination against himself individually based on gender.   Plaintiff alleges in his Amended Complaint that "Plaintiff was being subjected to gender discrimination and retaliation by Ms. Butcher" but there are no allegations regarding of what the gender discrimination consisted.  (Doc. 34 at ¶¶ 22-23).  Plaintiff testified that he notified HR that he was being treated differently and was being held to a different standard but when asked if he specified to HR that he believed his gender was the reason for the unfair treatment, Plaintiff responded "I don't recall."  (Doc. 86-1, Pl. Dep. at 78:23-80:12).  Even if Plaintiff had adequately notified HR that he felt he was being subjected to gender discrimination, Plaintiff has not specified any acts of alleged gender discrimination.  Therefore, the Court finds Plaintiff's vague accusations are insufficient proof that he had an objectively reasonable belief that he was being discriminated against by Butcher based on his gender.  *See Leigh*, 212 F.3d at 1217 ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.") (quoting *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)).  Moreover, because Plaintiff's alleged complaint of gender discrimination was not protected activity, any alleged complaint that Butcher was retaliating against Plaintiff for complaining is also not protected activity.  *See Hudson v. Blue Cross Blue Shield of Ala.*, No. 2:09-cv-920-JHH, 2010 WL 11519253, at *17 (N.D. Ala. Dec. 14, 2010), *aff'd*, 431 F. App'x 868 (11th Cir. 2011); *Butler*, 536 F.3d at 1214 (finding that because plaintiff's belief that offensive statements constituted an unlawful employment practice was not objectively reasonable, it follows that plaintiff's retaliation claim fails as a matter of law); *see also Van Portfliet v. H&R Block Mortg. Corp.,* 290 F. App'x 301, 304 (11th Cir. 2008) ("[B]ecause reporting the undisclosed racial slur failed to satisfy the statutorily protected

expression requirement, that expression can support no retaliation claim as a matter of law."). Plaintiff's failure to present sufficient evidence that he engaged in a protected activity is fatal to establishing his prima facie case of retaliation.

ii. *Adverse Employment Action*

While Defendant spends some portion of its Motion discussing why the Final Written Warning does not constitute an adverse employment action[8] and further discussing the Final Written Warning were it to be construed by the Court as an adverse employment action (*see* Doc. 86 at 19-25), Plaintiff does not advance the argument that the Final Written Warning was an adverse employment action.  In discussing the adverse employment action element of Plaintiff's prima facie case, Plaintiff notes only that "[i]t is undisputed, by all parties, that Plaintiff was terminated on March 1, 2018."  (Doc. 87 at 14) (citing Doc. 86-1, Pl. Dep. at 224:16-18; Doc. 86-5 at 185:18-22).   As such, the Court need only address Plaintiff's termination as the adverse employment action.  *See U.S. v. Perkins*, 204 F. App'x 799, 806 (11th Cir. 2006) ("With no substantive arguments to consider on these points, we do not address them.").

iii. *Causal Link*

To establish a causal link for a retaliation claim, a plaintiff need only show that "the protected activity and the adverse action were not wholly unrelated."  *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (internal quotation marks and emphasis

---

[8] Specifically, Defendant argues that, in a retaliation case, discipline, even if unfounded, is not an adverse employment action in the absence of "a reduction in pay, benefits, or responsibilities that would demonstrate an adverse effect." *Debe v. State Farm Mut. Auto. Ins. Co.*, 860 F. App'x 637, 639 (11th Cir. 2021). Defendant further asserts that Plaintiff admits that he did not lose any compensation and there were no changes to the terms and conditions of his employment as a result of the Final Written Warning.  (Doc. 86 at 19).

omitted).  This element is to be broadly construed.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated.  *Thomas*, 506 F.3d at 1364.  However, if there is a delay of more than three months between the protected activity and the adverse employment action, then the temporal proximity is not close enough, and the plaintiff must offer some other evidence tending to show causation.  *Id*. In addition, an intervening act of misconduct by the plaintiff can break the causal link between the protected conduct and the adverse employment action.  *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (*en banc*) (explaining that the plaintiff's intervening misconduct "eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination") and comparing *Fleming v. Boeing Co.,* 120 F.3d 242, 248 (11th Cir. 1997) (holding that the plaintiff had failed to establish causation, even though the employer refused to hire her for a permanent position shortly after she had filed a complaint of sexual harassment, because it was clear from the record that the plaintiff failed to meet the employer's qualifications for permanent employment)).

Here, Plaintiff does not argue that a close temporal proximity establishes a causal connection between the protected activity and his termination.  Indeed, the initial alleged protected activity occurred in "mid-2017," and Plaintiff was terminated approximately eight months later on March 1, 2018. *See Debe*, 860 F. App'x at 639-40 (three-to-four-month delay is too long and does not establish close temporal proximity, while a one-month gap may satisfy the test).  Even if the Court were to consider Plaintiff's January 2018 complaints of retaliation to HR as the protected activity from which to calculate the temporal proximity,

there was at least one intervening act of misconduct that breaks the causal link between the protected conduct and the adverse employment action; *i.e.*, Plaintiff's February 15, 2018 act of insubordination in sending Rodriguez to the SuperLawyers event.  The intervening act of insubordination diminishes any inference of causation that may have arisen out of the temporal proximity between the January 2018 complaints to HR and Plaintiff's termination. *See Henderson*, 442 F. App'x at 507.

Yet here Defendant does not argue that Plaintiff failed to establish temporal proximity or otherwise argue that Plaintiff's intervening misconduct eroded any causal connection. Instead, Defendant argues that Plaintiff cannot establish a causal link because he cannot meet the but-for causation standard set forth in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013).  (Doc. 86 at 16-18).  The Eleventh Circuit, however, has assumed without deciding that *Nassar*'s but-for causation standard applies at the pretext stage of the summary judgment analysis rather than the prima facie stage.  *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 n.13 (11th Cir. 2020) ("Likewise, we will assume here that the but-for test is to be applied at the pretext stage of the summary judgment examination, and our analysis so proceeds under this assumption.").  As such, the Court will address Defendant's but-for causation argument in pretext stage of its analysis below.  The Court need not otherwise decide whether Plaintiff can establish a causal link for prima facie case purposes given the fact that the parties did not properly address the issue and, even if Plaintiff could establish a prima facie case, Defendant has offered legitimate, nondiscriminatory reasons for Plaintiff's termination, which Plaintiff has failed to demonstrate as pretextual.

### b.  Legitimate, Non-Retaliatory Reasons for Plaintiff's Termination

Once the plaintiff has established a prima facie case, a presumption is created "that the

adverse action was the product of an intent to retaliate." *Bryant*, 575 F.3d at 1308.  The burden of production then shifts to the employer to articulate "legitimate reasons for the employment action to negate the inference of retaliation." *Goldsmith*, 996 F.2d at 1163.  If the defendant offers legitimate, nondiscriminatory reasons for the employment action, the presumption is rebutted, and the plaintiff then must demonstrate that the reasons offered are merely a pretext to mask retaliatory actions.  *Bryant*, 575 F.3d at 1308.  To establish the necessary causation, a plaintiff must show "that his … protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362.  In other words, "a plaintiff must prove that had [he] not complained, [he] would not have been fired." *Jefferson*, 891 F.3d at 924.  "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).

On November 16, 2017, Plaintiff was given a Final Written Warning that stated, "Any further misconduct or violation of company policies will result in termination."  (Doc. 85-12 at 2:30-31).   Defendant has proffered three legitimate, nondiscriminatory reasons for Plaintiff's termination—described by Defendant as examples of an ongoing pattern of insubordination (Doc. 86-4 at 90), all of which occurred after Plaintiff received the Final Written Warning.  Defendant's first legitimate, nondiscriminatory reason is that Plaintiff continued to expense multiple coffees per day after being directed to stop. An internal audit found that Plaintiff had expensed multiple coffees per day on at least 31 separate occasions after being specifically instructed not to do so in his Final Written Warning.  Defendant's second legitimate, nondiscriminatory reason is that Plaintiff incurred substantial expenses at the Annual Sales Meeting in January 2018 despite being directed not to.  Plaintiff admits that

he tried to expense more than $500 from the ASM.  Defendant's third and final legitimate, nondiscriminatory reason for Plaintiff's termination is that Plaintiff disregarded Butcher's directive not to send Rodriguez to the SuperLawyers event.  Plaintiff has stipulated that Butcher instructed him not to send Rodriguez to a SuperLawyers event and that he sent him anyway.  There is no dispute that Defendant has offered legitimate, nondiscriminatory reasons for Plaintiff's termination.

### c.  Pretext

Because Defendant proffered legitimate, nondiscriminatory reasons for terminating Plaintiff, Plaintiff "must introduce significantly probative evidence showing that the asserted reason[s] [are] merely a pretext for discrimination" in order to avoid summary judgment. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotations and citation omitted).  "[A] plaintiff is required to present at summary judgment enough evidence from which a reasonable juror could find [his] protected activity was a but-for cause of the adverse employment action." *James v. City of Montgomery*, 823 F. App'x 728, 735 (11th Cir. 2020).  "Stated another way, a plaintiff must prove that had [he] not complained, [he] would not have been fired." *Jefferson*, 891 F.3d at 924.

Therefore, the Court must now, considering all the evidence, "determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks omitted); *see also Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008).  To do this, the Court "evaluate[s] whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996), *cert. denied*, 521 U.S. 1129 (1997)); *see also Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995) (discussing methods of proving pretext).   The plaintiff must demonstrate both that the employer's proffered reasons are false and that the real reason was retaliation.   *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 891 (11th Cir. 2015) ("If the employer proffers multiple reasons, the plaintiff must rebut each one to survive summary judgment.").   Questioning the wisdom of the employer's reason is not sufficient.   *Combs*, 106 F.3d at 1543.   In other words, a plaintiff "cannot show pretext by recasting 'an employer's proffered nondiscriminatory reasons' or substituting 'his business judgment' for that of the employer's."   *Collier v. Harland Clarke Corp.*, 820 F. App'x 874, 880 (11th Cir. 2020) (citation omitted).   Defendant argues that Plaintiff both admitted that retaliation was not the "but-for" cause of his discharge and stipulated to one of the three acts of insubordination and, therefore, cannot establish pretext.   The Court agrees that Plaintiff has failed to demonstrate that Defendant's legitimate, nondiscriminatory reasons for the termination were pretext to mask retaliation.

Here, Plaintiff fails to present sufficient evidence that two of Defendant's legitimate, nondiscriminatory reasons were false[9] and that the real reason was retaliation.   Instead,

---

[9] Plaintiff may have raised a genuine issue of material fact regarding the circumstances surrounding Plaintiff's expense report for the January 2018 ASM.   Plaintiff does not deny that he expensed more than $500 at the ASM as "meals," both individual and group, despite instructions from Ballard and HR to RSMs not to expense meals during the ASM.   (Doc. 86-1, Pl. Dep. at 212:25-213:3; Doc. 86-7 at 164:11-25) (three meals a day were provided by Defendant at the ASM).   In fact, Plaintiff submitted an expense report from the ASM with six charges that he listed as "Meals – Alone" for "breakfast," "lunch," or "dinner."   (Doc. 86-

Plaintiff argues that Defendant's reasons are not good reasons for termination given the circumstances.  However, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on the reality as it exists outside of the decision maker's head."  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

Initially, the Final Written Warning instructed Plaintiff that "it is not the company's practice to pay for multiple coffees during the day," and "you must immediately cease engaging in such behavior."  (Doc. 86-4 at 84:26-27, 85:30-31).  Plaintiff admits that he continued to expense multiple coffees a day on at least 31 occasions.  (Doc. 87 at 6; Doc. 87-1 at ¶ 27 ("I did have occasions where I had multiple Starbucks expenses on the same day…."); Doc. 86-6 at 68: 8-49 (showing 31 days with multiple Starbucks transactions)).  Plaintiff's justifications that he "substantially reduced his coffee related expenses" and "only had multiple Starbucks purchases on days he met with CDC and/or clients" are unavailing.  (Doc. 87 at 6).  Defendant's Final Written Warning did not instruct Plaintiff to just reduce coffee-related expenses, nor did it allow Plaintiff multiple coffees per day under certain circumstances, such as meeting with CDC and/or clients.  Plaintiff's attempt to recast the

---

6 at 30:14-20, 30:28-33, 31:39-45, 32:11-30).  Plaintiff also expensed $570.03 as "Meals - Group."  (Doc. 86-6 at 30:34-31:38, 31:45-32:10).  However, Plaintiff denies buying any meals and asserts that he had to use the "group meal" designation in Defendant's expense report program due to limited dropdown menu options for reporting expenses.  (Doc. 86-1, Pl. Dep. at 212:25-214:20).  Plaintiff further asserts that Ballard had no issues with RSMs "buy[ing] a couple of folks a drink" and that his main concern was that the RSMs not expense "large lunches or dinner" and/or "large bar tabs."  (Doc. 89-2 at 102:16-103:12).  Plaintiff only admits to buying some drinks and snacks for his team during meetings, which Ballard indicated would be an acceptable purchase.  (Doc. 86-1, Pl. Dep. at 213:11-22; Doc. 89-2 at 102:16-103:12; Doc. 88-2 at ¶ 25).  The Court, however, need not address this issue because Defendant has provided two other legitimate, nondiscriminatory reasons for Plaintiff's termination for which Plaintiff has not established pretext.  *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308-09 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").

requirements of the Final Written Warning to requirements that he considered reasonable or thought Defendant should consider reasonable does not make Defendant's proffered reason false or unworthy of credence. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient."). As such, Plaintiff has failed to establish that this proffered reason for his termination is false.

Moreover, Plaintiff acknowledges that Butcher instructed him not to send Rodriguez to a SuperLawyers event and that he sent Rodriguez anyway. (Doc. 85 at ¶ 34). Plaintiff again attempts to establish pretext by justifying as reasonable his insubordination of Butcher's instructions. (Doc. 87 at 7). Plaintiff asserts that after being instructed not to send Rodriguez to the event for, at least in part, being late to a meeting, he learned that Rodriguez was late due to needing to get his daughter medical treatment after suffering a seizure. (Doc. 86-1, Pl. Dep. at 101:14-102:3). Plaintiff testified that he tried to speak to Butcher about the situation, but she did not respond. (*Id.*). Plaintiff continues that he believed if Rodriguez was not allowed to attend the event due to providing his daughter medical attention, Defendant could be liable or in violation of the law. (Doc. 86-1, Pl. Dep. at 103:25-104:7; Doc. 86-4 at 88:2-6). However, the fact that Plaintiff thought it a better course of action to invite Rodriguez to the event after he learned Rodriguez's daughter's medical treatment was the reason Rodriguez was late the day prior or because he believed not inviting Rodriguez would open Defendant up to liability is irrelevant to a pretext analysis. (Doc. 87 at 7). *See Clark*, 601 F. App'x at 896; *see also Alvarez*, 610 F.3d at 1266 (the "question is whether her employers were dissatisfied with her for … non-discriminatory reasons, even if mistakenly or unfairly so"). Plaintiff may

not substitute his business judgment for that of Defendant's in order to establish pretext. Plaintiff has failed to establish that this second proffered reason for his termination is false.

Even if Plaintiff could establish that each of the proffered reasons is false, the question becomes whether Defendant instead merely used these alleged acts of insubordination as cover for retaliating against him for complaining of gender discrimination.   Defendant contends that Plaintiff's own deposition testimony proves that his alleged protected activity had nothing to do with his termination and was not the "but-for" cause.   Defendant argues that Plaintiff testified that Ballard and Butcher acted for non-retaliatory reasons and failed to even identify Smith as someone who took retaliatory action.   Plaintiff acknowledges that the decision to terminate him was made jointly by Butcher, Ballard, and Smith, (Doc. 87 at 16, ¶ 6; Doc. 86-5 at 183:11-23; Doc. 86-7 at 157:24-158:5), and Plaintiff identified Ballard and Butcher as the individuals that retaliated against him (Doc. 86-1, Pl. Dep. at 13:20-14:8). Plaintiff, however, did not testify, or present evidence, that Ballard was motivated by a desire to retaliate against him for complaining about gender discrimination.   When asked why Ballard wanted to terminate him, Plaintiff testified in his deposition:

> [Y]ou asked me why do I feel William Ballard wanted me out.  I was coming up with great ideas, I even got a standing ovation one time from my own teammates on a recommendation.  I don't think he liked the fact that he wasn't the main guy when it came to some of these great ideas.  Which is unheard of. But alls I know, he frowned upon that.

(Doc. 86-1, Pl. Dep. at 87:8-90:24).  Moreover, when asked why he believed Butcher wanted to terminate his employment, Plaintiff testified that Butcher was "out to get [him] because she didn't like [him]."  (Doc. 86-1, Pl. Dep. at 217:22-218:14).  Plaintiff testified that Butcher managed based on whom she liked, not based on the individual's skill set, knowledge or

expertise and that she simply did not like Plaintiff.[10]   (Doc. 86-1, Pl. Dep. at 217:22-218:14). Defendant further argues that the actual decisionmaker in Plaintiff's termination was Smith, whom Plaintiff failed to identify as having retaliated against him at all.   *Compare* Doc. 86-1, Pl. Dep. at 13:20-14:8 with Doc. 86-7, Butcher Dep. at 157:21-158:5 and Doc. 86-5, Smith Dep. at 183:16-23.   Defendant asserts that, when asked whether he would have been terminated regardless of whether he had complained to HR, Plaintiff's testimony was, "It appears," which, Defendant contends, proves that Plaintiff cannot show that had he not complained, he would not have been fired.   (Doc. 86-1, Pl. Dep. at 225:10-12).

In response, Plaintiff argues that he did not admit that his employment would have been terminated regardless of whether he complained to HR.   Plaintiff asserts that he, in fact, testified that Butcher and Ballard had "made stuff up to get him out," "treated him unfairly" and "differently" than his peers and held him to a "different standard," and thus, that "it appear[ed]" he would be terminated by Butcher and Ballard despite his complaints to HR about their retaliation.   (Doc. 87 at 15 n.11; Doc. 86-1, Pl. Dep. at 225:1-12).   This argument fails to support Plaintiff's position as unfair treatment is not retaliatory if it is motivated by Butcher's dislike of Plaintiff and Ballard's jealousy of him and is unrelated to an internal complaint.   In addition, Plaintiff contends that Ballard was Butcher's mentor and retaliated against Plaintiff to protect Butcher and that Smith retaliated against Plaintiff because she was new and did not want to anger Butcher and Ballard.   (Doc. 87 at 15).   These arguments appear to be speculation as to why Ballard and Smith might support Butcher's alleged retaliation

---

[10] Favoritism towards friends does not violate Title VII and complaining of such alleged favoritism is not protected activity. *See Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 (11th Cir. 1990) (quoting *Holder v. City of Raleigh*, 867 F.2d 823, 825-26 (4th Cir. 1989) ("To hold that favoritism toward friends and relatives is *per se* violative of Title VII would be, in effect, to rewrite federal law.")).

27

against Plaintiff. This speculation, however, is not supported by any relevant evidence. Moreover, Plaintiff fails to cite to any supporting authority that these alleged connections between his protected activity and his termination constitute "but-for" evidence.

The evidence before the Court does not show that the real "but-for" reason for Plaintiff's termination was retaliation, and Plaintiff's unsupported, conclusory assertions to the contrary are unavailing. Plaintiff has failed to rebut Defendant's legitimate, nondiscriminatory reasons for Plaintiff's termination with significantly probative evidence showing that the asserted reasons are merely pretext for discrimination. *See City of Fairburn*, 482 F.3d at 1309.

## IV. CONCLUSION

Because Plaintiff has failed to establish a prima facie case of retaliation and has failed to demonstrate that Defendant's legitimate, nondiscriminatory reasons for Plaintiff's termination were pretextual, it is hereby **ORDERED**:

(1) Defendant's Dispositive Motion for Summary Judgment (Doc. 86) is **GRANTED**.

(2) The Clerk is directed to enter judgment in Defendant's favor and close this case.

**ORDERED** in Tampa, Florida, this 8th day of December 2021.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE